60354. TALLEY et al. v. CITY TANK CORPORATION et al.

CARLEY, Judge.

On May 10, 1975, Jim Talley, an employee of the Sanitation Department of the City of LaGrange (City), was working on a garbage truck which had been manufactured originally by appellee-City Tank Corporation (CTC) and assembled and sold to the City by appellee-Service Systems, Inc. (SSI). The truck had been originally designed and equipped with a rear lifting and loading system operated in the following manner: The truck backed up to a trash container until contact was made between slotted pivot plates attached to the truck and a steel bar or bars, called trunions, running across the top of the container. The container would then be in position between the pivot plates mounted on the truck with the trunions on the container touching the plates and extending beyond them. When thus positioned, a cable attached to a roller mounted on the top of the truck was connected to the rear of the container. The cable would then be drawn upward, pulling the rear of the container off the ground. The weight of the container and the slope of the pivot plates caused the trunions to slide downward into the angled slots of the plates until each trunion became seated in the pivot point of each plate. As thus designed, if the trunions, which extended beyond and to the outside of the plates, began to dismount from the pivot point in the plates, the container would be restrained from lateral movement by the plates. With the trunions engaged in the slots of the pivot plates acting as a pivot bar, the container would be raised to a vertical

position and empty by gravity into the truck.

The City, however, had found it necessary to modify the lifting system on its garbage trucks in order to accommodate the design of its trash containers. The modification of the truck on which Talley was working had been made by the City's own maintenance personnel. The LaGrange modification required that the pivot plate as originally designed be almost totally removed and replaced with an entirely different pivot system. Replacing the original design, the new LaGrange system consisted of a "J" shaped bracket plate welded to and extending from the two sides of the back of the truck. Unlike the original open-slot plate design, the outside of the "J" brackets was enclosed so that the trunions on the container could not extend through the "J" brackets when resting in the pivot point. Consequently, in order that they could fit freely into and out of the "J" brackets with the enclosed sides, the trunions on the City's trash containers had to be shorter than those contemplated for use with the truck as originally designed. To this end the City found it necessary to also modify trash containers it purchased by shortening the trunions and removing the flanges, if any, from the trunions. Thus, the LaGrange design in this entirety required alteration of both the lifting system of the truck and the containers with which the original system was designed to couple. In short, the only unmodified component of the original lift system was the cable mechanism for hoisting the container after coupling was achieved. The original attachment components, the plates and trunions, whereby the truck and container were engaged so as to form the pivotal axis around which the container was raised and lowered were removed and replaced.

While Talley was working on the redesigned truck in May of 1975, a trash container, which had been hoisted from the ground into position to dump its contents, uncoupled from the rear of the truck and swung laterally without restraint on the end of the hoisting cable. Apparently a shortened trunion had dismounted from the "J" bracket and the then free-swinging container struck and fell on Talley. Talley died some three hours later.

The instant suit was brought against CTC and SSI in 1977 by appellant, Talley's wife, the allegations being that their negligence and defective product had resulted in the death of her husband. After discovery, both CTC and SSI moved for summary judgment. Several continuances later a hearing was held, the trial court heard arguments, and the parties were granted until June 4, 1979, to take depositions and submit affidavits pending consideration of the motion. On July 5, 1979, summary judgment was granted to both CTC and SSI. Thereafter, appellant discovered that a deposition had

not been filed and obtained an order vacating the original grant of summary judgment. The trial court then reconsidered the motions and reinstated the grant of summary judgment on August 8, 1979. In September appellant timely filed her notice of appeal from this reinstated order and the case was docketed in this court. Subsequently the trial court entered an order in the case stating that in granting the motions no consideration had been given to two depositions which had been filed under an erroneous docket number until November of 1979, but that, having read them, "none of the testimony . . . would alter the Court's granting of the motion for summary judgment." When this case was orally argued in January of 1980 pursuant to the notice of appeal from the order of August 1979, it was our determination that since that order did not recite that the trial court had considered the entire record in granting summary judgment and since it appeared from the record then before us that two depositions were neither opened nor considered by the trial court until after the notice of appeal was filed, the case should be remanded "with the direction that the trial court vacate the previous order granting summary judgment, consider the entire record including all depositions taken in the case, and enter a new order after which the losing party may file a new notice of appeal." This disposition of the appeal was necessary because the November 1979 order of the trial court, reciting consideration of the two depositions, was without effect, having been entered subsequent to the filing of the notice of appeal. *Brown v. Wilson Chevrolet-Olds, Inc.,* 150 Ga. App. 525, 531 (258 SE2d 139) (1979). Our remand order of January 1980 further stated that "[i]n view of the stipulation by counsel in this court during oral argument, it is ordered that the trial court shall proceed immediately with the consideration and determination of the motion for summary judgment in accordance with this order without the necessity of the filing of a new motion for summary judgment or response thereto."

Pursuant to our remand of the case, on January 16, 1980, the trial court vacated its original order of August 8, 1979. On January 22, 1980, the trial court again granted the appellees' motions for summary judgment, and, in so doing, specifically refused to consider affidavits in opposition to the motion which had been filed in January 1980 after this court had remanded the case for entry of a new order. When it was discovered that the remittitur of this court remanding the case had not in fact been filed in the trial court until February 12, 1980, and not made the order of the trial court until February 18, 1980, a new order was entered on the latter date by the trial court which yet again granted summary judgment to appellees. This order specifically incorporated therein the previous January 1980 orders of

the trial court. It is from this February 18, 1980 order that the instant appeal is taken.

1. On January 22, 1980 when the trial court originally reentered summary judgment, it lacked jurisdiction over the case, the remittitur of this court remanding for the entry of a new order not having been filed with the clerk of the lower court. Cf. *Hagan v. Robert & Co. Assoc.,* 222 Ga. 469, 472 (2) (150 SE2d 663) (1966). Therefore, the order of January 22, 1980 was a nullity. *Park v. Minton,* 229 Ga. 765, 769 (3) (194 SE2d 465) (1972). However, we find unpersuasive appellant's argument that the February 18, 1980 order was itself a nullity merely because it made reference to the prior void order and incorporated it by reference. Cases relied upon by appellant do not support her position. Unlike the cases cited by appellant it is clear that the February order in the instant case *was* entered at a time when the trial court had jurisdiction over the case. Code Ann. § 6-1804. We know of no reason why an order entered at a time when the trial court *has* jurisdiction may not incorporate by reference a previous order which was void only for the lack of that jurisdiction. It is clear that in compliance with the mandate of this court that a new order be entered the incorporation by reference of the prior void order was done merely to avoid the necessity of reentering yet again a rather lengthy and scholarly order in the case. The February 18, 1980 order was a valid order of the trial court in all respects and did not, as appellant urges, "breathe life" into a void order. On the contrary, the incorporation by reference of the prior order "breathed life" into the trial court's grant of summary judgment, giving the reasons for the ruling while obviating the necessity to reenter at a time when jurisdiction was established the entire text of the voluminous void order. To hold otherwise would place form over substance and this we decline to do.

2. Appellant next urges that it was error for the trial court to refuse to consider certain affidavits submitted by her in opposition to the motions which affidavits were filed in the case during the interim between this court's order of January, 1980, remanding for entry of a new order, and February 1980, when a valid order granting summary judgment was finally entered.

"An affidavit made in opposition to a motion for summary judgment not served at least one day before the hearing is barred by the Civil Practice Act from consideration as evidence unless the record discloses the trial court, in the exercise of its discretion, has allowed the affidavit to be served and considered." *Malone v. Ottinger,* 118 Ga. App. 778, 779 (3) (165 SE2d 660) (1968). The affidavits here in question were served and filed long after the only hearing on the motion. Contrary to the assertion made on appeal —

which is in contravention of the stipulation entered into before this court — the effect of our order of January 10, 1980, was not to reverse the grant of summary judgment on the merits, reopen the record and require a new motion and hearing. Appellant's stipulation and our order made pursuant thereto were to the effect that the judgment would be vacated and the trial court would be reinvested with jurisdiction to enter a new order based upon the inadvertently overlooked evidence of record at the time of the grant of summary judgment *without* the necessity of a new motion or another hearing. Under these circumstances, it was within the trial court's discretion to allow or disallow additional evidence on the motion. Cf. *Clayton County v. Clayton County Homeowners Assn.,* 231 Ga. 562 (203 SE2d 373) (1974). The trial court in its February 18, 1980 order found that appellant's counsel was dilatory with reference to the affidavits filed after this court's remand of the case and did not consider them. We find no error in this action by the trial court. *Gunter v. Nat. City Bank,* 239 Ga. 496, 497 (238 SE2d 48) (1977).

3. We now consider appellant's contention that there remain genuine issues of material fact and that, therefore, the trial court erroneously granted summary judgment in favor of appellees.

Whether proceeding under a strict liability or a negligence theory, "proximate cause" is a necessary element of appellant's case. *Center Chemical Co. v. Parzini,* 234 Ga. 868 (218 SE2d 580) (1975); *Union Carbide Corp. v. Holton,* 136 Ga. App. 726 (222 SE2d 105) (1975). Whether the truck in the instant case is alleged to be "defective" or negligent in design, the proximate causal connection between that design and the death of Mr. Talley has been negated by the evidence.

Under Code Ann. § 105-106 strict liability is imposed for injuries suffered "because the property when sold by the manufacturer was not merchantable and reasonably suited to the use intended and its condition *when sold* is the proximate cause of the injury sustained." Thus the injury must be the proximate result of a defect in the product which existed at the time sold. It is undisputed in the instant case that Mr. Talley's death was the result of a trash container uncoupling from the back of the garbage truck and swinging laterally on the cable around the side of the truck. The evidence is also uncontroverted that the original coupling mechanism as designed, manufactured and sold was totally eliminated and replaced by another entirely different design. When a manufacturer is sued under Code Ann. § 105-106 for injuries proximately resulting from a defect in the design of his product existing at the time of sale, obviously if the design of that product has been independently altered, eliminated and replaced by a third party after the sale and injuries

then result, those injuries cannot be traced to or be the proximate result of the manufacturer's original design which did not exist at the time of injury. "At the time of the tragic accident, the thing being used was not the thing sold." Young v. Aeroil Prod. Co., 248 F2d 185, 190 (9th Cir. 1957). One of the conditions for imposition of strict liability against a manufacturer of "defective" products is that the product "is expected to and *does reach the user or consumer without substantial change* in the condition in which it is sold." (Emphasis supplied.) Restatement of the Law, Torts 2d, 348, § 402A. In some cases it may be a jury question as to whether the product's original design has been merely slightly or somewhat modified. In such cases, the jury must determine whether the original manufacturer's design was defective and, if so, whether the proximate cause of the injuries sustained was the original defective design or the subsequent modification. However, where, as here, the evidence is un-controverted that the original design of the manufacturer's product has been totally eliminated and replaced so that the only similarity between the old and new is the mere basic function to be performed, no such issue remains. See generally Coleman v. Verson Allsteel Press Co., 382 NE2d 36 (App. Ct. Ill. 1978). In such a case that the original design which has been eliminated may have been "defective" or that the new design may be "safer" avails the injured party nothing. Strict liability is imposed for *injuries* which are the proximate result of product defects, not for the manufacture of defective products. Unless the manufacturer's defective product can be shown to be the proximate cause of the *injuries* there can be no recovery. A manufacturer has the absolute right to have his strict liability *for injuries* adjudged on the basis of the design of his own marketed product and not that of someone else. See *Ellis v. Rich's, Inc.,* 233 Ga. 573 (212 SE2d 373) (1975). Since the evidence shows that the product which failed and resulted in injuries is not that manufactured by the defendant, summary judgment was properly granted as to the "defective design" theory. Coleman v. Verson Allsteel Press Co., 382 NE2d 36, supra.

Likewise, we find summary judgment properly granted as to the alleged "negligent" design of the coupling component of the truck. The evidence is uncontroverted that the truck was built to engage with a specific type of trash container in a specific manner and, to that end, a specific design was incorporated by the manufacturer into the coupling device. That design was eliminated and replaced by an entirely different design so that the City could use the truck to lift and empty its own type of containers. Summary judgment was, therefore, properly granted as to a recovery on a negligence theory. *Union Carbide Corp. v. Holton,* 136 Ga. App. 726, 728 (1) supra.

Our analysis is not changed by the fact that the cable component, whereby the containers were actually lifted after coupling was completed, was unmodified by the City. Appellant urges that the truck was "defective" in a products liability sense because, if the coupling device failed and a container unloosened, there was nothing in the design of the cable system to prevent the container from swinging laterally and striking someone standing on the side of the truck, which is what happened here. However, we find this argument, which is predicated upon the failure of the coupling device, flawed.

The test is whether the product was merchantable and reasonably suited to the use intended as determined *at the time the product is sold* and when a product is alleged to be "defective" for lack of safety devices, the manufacturer is entitled to have the "defectiveness" of his product considered in the context of the overall original design of the item. This is especially true when the alleged defect in a product is the absence of safety features on a component of the product which would prevent injury in the event another component fails. This is an allegation of, in effect, merely one defect — the overall unsafeness of the failed component. We are, therefore, of the opinion that when the alleged defect in a product is the *absence* of safety features, a manufacturer is entitled to demonstrate that this alleged defect is ultimately based upon the failure of an integral part of the overall product, the original design of which component has been independently eliminated and replaced by another and that there is thus no causal connection between any defect in the product existing at the time of sale and the injury. Such is the case here. Appellant's argument is premised upon the failure of the coupling device. If the coupling device failed, then the cable should have been designed to restrain the movement of the container. However, the undisputed evidence in the instant case is that the coupling device which failed was *not* that manufactured by appellees. It cannot be disputed that Talley's death would not have resulted but for the uncoupling of the container from the rear of the truck. Had the container not first disengaged, it would not have swung laterally and the absence of restraints on the cabling device would not have been a factor in Talley's death. Thus, while appellant's evidence that the "proximate cause" of the death was the lack of restraint on the unmodified cabling system may be true in a temporal sense, it is beyond question that the uncoupling of the container is the "proximate cause" of the death in the legal meaning of that phrase. *Milton Bradley Co. v. Cooper,* 79 Ga. App. 302 (53 SE2d 761) (1949). And it is beyond dispute that the coupling mechanism which did fail was not appellees' product but, rather, the City's. Thus even though

the originally designed coupling device may have been defective and the City's design may have been safer, the fact remains that no defective product of appellees can ever be shown to be the proximate cause of *Talley's* death. This analysis would not, of course, attach where under any construction of the evidence the legal proximate cause of an injury could be found to be the unmodified component of an otherwise altered product. However, to hold that the absence of features to prevent injury resulting from the failure of a component which has been totally eliminated from the product as originally designed would, in our opinion, be an unwarranted extension of the theory of strict liability.

Similarily, we find summary judgment properly granted as to any theory of recovery based upon the "negligent" design of the cable mechanism. *McNeely v. Harrison,* 138 Ga. App. 310 (226 SE2d 112) (1976).

We turn to the issue of the alleged defectiveness of the truck due to the failure to warn. "Where, . . . , [the seller] has reason to anticipate that danger may result from a particular use, . . . , he may be required to give adequate warning of the danger . . . , and a product sold without such warning is in a defective condition." Restatement of the Law, Torts 2d, 351-352, § 402A, Comment h. A duty to warn of danger in the use of a product extends only to the use of the product in the manner reasonably contemplated and anticipated by the manufacturer. When the use to which a product was being put at the time of injury is not that originally intended by the manufacture, the determination of whether strict liability may be asserted as a viable theory of recovery or whether the manufacturer is insulated from liability because the use of the product was "abnormal" and intervening depends, initially, upon the foreseeability that the product would be put to that use. Cf. *Union Carbide Corp. v. Holton,* 136 Ga. App. 726, 729, supra. Appellant argues then, in effect, that appellees should have foreseen the City's redesign and replacement and should have warned against the modification and against those dangers which might occur when the truck containing the new system was put to use by the City. We do not agree. The affidavit of the garage superintendent of the City states that the municipality "through the garage, adopted a policy of standardizing all new equipment so that all of the trucks in the City's fleet could pick up all the containers owned by the City. These changes were made at the City of LaGrange Garage under my direction and control . . . These modifications specified were made *without notice to or communication with either City Tank Corporation or Service Systems, Inc."* (Emphasis supplied.)

Even were we to ignore this evidence of the City's unequivocal

assumption of sole responsibility for the design of the coupling device, we find summary judgment was nonetheless properly granted to appellees under the facts. The undisputed evidence is that the City bought, paid for and accepted delivery of a Model LM320 truck designed to function in a particular way. That design was, in the component relevant to the injury, totally redesigned and replaced by the City's own personnel for its own particular reasons and individualized use which resulted in a product essentially different from that originally designed and manufactured. Under these circumstances, to hold as appellant urges would place the unrealistic burden on manufacturers of all products which can be redesigned by consumers to warn and instruct as to the manner in which that redesign should be made and the resulting new product safely operated. Anderson v. Heron Engineering Co., 575 P2d 16 (Colo. Ct. of App. 1977). We hold there is no duty to warn that a redesign and replacement of the integral and ultimately injurious component of a product will destroy the original design and may result in an essentially different product with new "dangerous propensities." The consumer's conscious decision not to use the product as it was originally manufactured and designed creates a danger readily apparent even without a warning. See generally Berry v. Eckhardt Porsche Audi, Inc., 578 P2d 1195 (Okla. 1978). An "obvious" danger of totally redesigning and replacing an integral component of a product to facilitate the consumer's own individual particularized use of the product is that elimination and replacement of the manufacturer's original design may result in an instrumentality which will be unsafe for the consumer's purpose. There is no duty to warn of the obvious danger of using a manufacturer's product as the mere foundation from which a redesigned instrumentality will be produced. Cf. Vance v. Miller-Taylor Shoe Co., 147 Ga. App. 812, 813 (2) (251 SE2d 52) (1978). In such circumstances "[i]t was instead the duty of the person reusing [the product] to make it safe for the purpose for which he intended to use it. In effect, [the manufacturer] had no 'duty to protect the [consumer] against such an intervening cause.' [Cit.]" Union Carbide Corp. v. Holton, 136 Ga. App. 726, 730, supra.

For the reasons discussed above, summary judgment was properly granted to appellees. Appellees have demonstrated that the product being used at the time of the injury was not that manufactured by them. Appellant has produced no evidence causally connecting the injuries to her husband with any defect in appellees' product as alleged in her complaint. Coleman v. Verson Allsteel Press Co., 382 NE2d 36, supra. If, in fact, Talley died as the result of the breach of any duty owed to him with reference to the coupling device

on the truck, that duty was owed by the City not appellees. Our resolution of the case on these grounds makes consideration of any remaining enumerations of error unnecessary.

*Judgments affirmed. Quillian, C. J., and Shulman, P. J., concur.*

DECIDED MARCH 9, 1981 —
REHEARING DENIED MARCH 30, 1981.

*Richard C. Freeman III*, for appellants.
*Howell Hollis, Joe C. Freeman, James M. Poe*, for appellees.